**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JEFFREY K. KOHN, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| UNUMPROVIDENT CORPORATION, | : | |
| Defendant | : | No. 2:04-cv-4929 |

_____

<u>MEMORANDUM RE: SUMMARY JUDGMENT</u>

**Baylson, J.**                                                                 **October 31, 2008**

This case presents the question whether the denial of benefits is necessary to trigger a suit

under the Pennsylvania Bad Faith Insurance Statute,  42 Pa. Cons. Stat. Ann. § 8371.  Viewing

the evidence in the light most favorable to the non-moving party, the Court finds that Plaintiff

has produced sufficient facts to warrant trial on his claims of bad faith and the common law tort

of invasion of privacy, and this Court will therefore deny Defendant's Motion for Summary

Judgment.

**I.        Background and Procedural History**

In June 1999, Plaintiff Jeffrey Kohn, M.D. (hereinafter "Kohn"), a practicing psychiatrist,

was attacked by one of his patients.  In September 1999, several months after the attack, Kohn

ended his psychiatry practice.  Kohn filed for benefits arising out of three disability insurance

policies issued to him by Provident Mutual Life Insurance Company.[1]   Kohn submitted the claim

to UnumProvident Corporation (hereinafter "UnumProvident," "Unum") in November 1999 after

closing his practice, claiming that he suffered, <u>inter alia</u>, post-traumatic stress disorder, a fear of

being around other people, and anxiety, which prohibited him from effectively providing

treatment to his patients.  Unum began processing Kohn's claim and started its inquiry into

Kohn's accident, his current psychological status, and how the attack had impacted his life.

During the initial disclosures, Kohn notified Unum that, in addition to his psychiatry practice, he

was also engaged in an antiques business, which required him to travel frequently.  Unum

apparently became suspicious of Kohn's disability claim upon being informed of this additional

business and subsequently engaged in an extensive investigation of Kohn's lifestyle.

In January 2000, Unum assigned the management and investigation of Kohn's disability

claim to Sarah McKinnon (hereinafter "McKinnon").  Her responsibilities for handling Kohn's

claim included gathering the relevant medical, financial, and vocational information and

ultimately deciding whether to make a payment on the claim.  On January 4, 2000, McKinnon

issued a request for additional information to Kohn concerning the medical opinions of his

physicians, the elimination periods of the disability policies, and Kohn's date of loss (i.e., the

date from which eligibility for benefits would be measured).  Kohn responded with the first of

many disagreements between the parties.  Kohn challenged his date of loss, arguing that the date

---

[1] Provident Mutual Life Insurance Company was the issuer of Kohn's disability policies. Another company, Provident Life and Accident Insurance Company, administers several claims for Provident Mutual Life, including Kohn's.  Both Provident Life and Accident Insurance Company, as a subsidiary of UnumProvident, and Unum Provident, the defendant in this case, will be referred to collectively as UnumProvident.

should be the day of the attack; Unum responded by asserting that the insurance policy only permitted a finding of a disability where there was active medical treatment.

Later, during McKinnon's investigation, she sent a request for a "field visit" and "surveillance" of Kohn to Unum's field and vendor services department, which subsequently assigned these duties to Kevin Moran (hereinafter "Moran").  As part of McKinnon's notice to Moran that he would be working the case, McKinnon warned Moran that Kohn was a "very tricky guy."  After being assigned to the claim, Moran began his investigation by issuing requests for personal interviews of Kohn and other information.  While the parties do not dispute that these field interviews between Moran and Kohn did not occur, they dispute as to exactly why they did not occur.  Unum alleges that Kohn refused to meet unless he was contractually required to do so.  Kohn, on the other hand, insists that Unum unilaterally terminated the interview requests despite his willingness to provide whatever information they needed.

A.     Insight's Investigation of Kohn

On February 23, 2000, Moran contacted a separate firm not a party to this case, Insight Investigations, to conduct the surveillance of Kohn to determine how the disability had affected his daily life.  The relationship between Unum and Insight and how extensively Unum managed Insight's investigation are also disputed by the parties.  Kohn alleges that Unum exhibited considerable control over Insight's investigation into Kohn's life.  According to Kohn, Unum set the "scope, needs, extent, and budget of the investigation," and Insight "could not exceed the parameters of the surveillance without Unum's prior approval."  Unum's Vice President, Don Provonsha, acknowledged that any outside investigator was required to get authorization for its

-3-

action during the investigation.  (Provonsha Dep. 63:5-13, 244:1-253:17.)  Unum, on the other hand, contends that Insight essentially was an independent contractor with free rein to conduct the investigation of Kohn through whatever means it chose.

The manner by which Insight and/or Unum conducted its surveillance of Kohn is the focal point of Plaintiff's Complaint.  During the course of Insight's investigation into Kohn's background, a list of phone numbers that Kohn dialed on his cellular phone was obtained by Moran.  (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. A.)  The list contained the phone numbers that Kohn called during several scattered periods of time.  Kohn has produced records from AT&T, his wireless phone provider, indicating that an individual who claimed to be Kohn asked an AT&T customer service representative several times to go over his call log entry by entry.  (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. D.)  Who actually made the call to AT&T is significantly disputed.  Kohn has asserted under oath that he never made the call to AT&T to get the call entries and that he had no reason to call, given that his phone records were available to him monthly when he received his bill (Attach. to Pl.'s Opp'n Def.'s Mot. Summ. J., Kohn Certification.); Kohn instead contends that Unum or Insight must have called AT&T, pretended to be Kohn, and thereby created the list of Kohn's outgoing calls.  Moran, Guy Tolomeo, the partial owner of Insight Investigations, and Robert Hoag, the Insight manager assigned to the investigation, deny that they obtained the records and/or assert that another party got the phone

records.[2]  What is clear, though, is that Moran did eventually come into possession of Kohn's

wireless phone records.  (See, e.g., Moran Dep. 22:3-5.)

The parties also significantly dispute how Unum or Insight used the phone records once

they received them.  The list that Kohn discovered that was in Moran's possession also contained

several notations in Moran's handwriting.  (Moran Dep. 8:16-9:1.)  The notations, marked beside

several phone numbers on the list, included names and locations for some of the phone numbers

and even contained a notation on the dates for Kohn's billing cycle.  (Pl.'s Opp'n Def.'s Mot.

Summ. J. Ex. A.)  Moran testified that he could not recall exactly how he got the information for

the phone numbers.  (Moran Dep. 14:4-11.)  Kohn has produced evidence that at least one of

those phone numbers, the Springfield Antique Show, was called by Moran or Chris Gerdvil, an

---

[2] See (Moran Dep. 9:4-8) ("Q.  Where did this document come from?  Where did it
originate?  A.  Insight Investigations.  Q.  Insight sent it to you?  A.  I don't know.  I'm
assuming."); (Moran Dep. 11:19-20) ("Q.  And you said it came from Insight?  A.  I believe,
yes."); (Tolomeo Dep. 82:4-22) ("Q.  Mr. Tolomeo, I show you a document which has been
labeled Deposition Exhibit Tolomeo-4 for identification.  Take a minute and look at it and tell
me if you recognize it.  A.  As of – I do recognize it.  I've seen this yesterday in my attorney's
office.  Q.  When was the first time you'd seen it?  A.  Yesterday. . . . Q.  Do you know where it
came from?  A.  No."); (Tolomeo Dep. 101:15-20) ("Q.  To your knowledge, did anyone,
anyone, Insight, Unum, outside, approach AT&T and ask for a copy of Dr. Kohn's cell phone
records?  A.  No.  Q.  You have no knowledge of that?  A.  No."); (Tolomeo Dep. 105:20-22)
("Q.  Did you ever obtain cell phone records for Kevin Moran in one of his investigations?  A.
To my knowledge, no."); (Hoag Dep. 30:3-13) ("Have you ever seen this document before?  A.
Not that I recall.  It doesn't mean I hadn't then at a time flipping through the file.  Q.  Do you
recognize any handwriting on that document?  A.  I recognize it as not mine. . . . No, I don't
recognize this handwriting at all."); (Hoag Dep. 31:22-32:13) ("Q.  Are you aware of anyone ever
calling a service provider like AT&T or Cingular and asking for a calling history?  A.  No.  Q.
Are you aware of anyone posing as a subject of an investigation and calling the service provider
and asking for a call history?  A.  Subject meaning the individual under the investigation?  Q.
Yes.  A.  No.  Q.  Someone posing as that person.  A.  Right.  From Insight you're asking?  Q.
From Insight or Unum or anybody at anytime – A.  No.").

Insight investigator, one or two times to determine if Kohn's antique business would be at the show.  (Gerdvil Dep. 157:6-158:13.)

       B.    <u>Unum's Suspension and Denial of Disability Benefits</u>

On March 31, 2000, Unum denied Kohn's claim for disability benefits.  (Def.'s Statement of Undisputed Facts ¶ 60; Pl.'s Counterstatement of Undisputed Facts ¶ 83.)  Unum had requested the treatment records from Kohn's psychiatrist in order to consider his claim.  Kohn initially refused to provide them to Unum.  When Unum contacted the psychiatrist directly, the psychiatrist offered to provide Unum with a "narrative" report of his treatment, but the doctor would not release the treatment records.  Unum alleges that their denial of the claim was purely based on the failure to provide the psychiatrist's treatment records and that Kohn stubbornly refused to provide the documents by challenging their legal right to possess them.  Kohn, on the other hand, argued that Unum had no contractual right to seek the treatment records from the psychiatrist.  Unum and Kohn eventually came to an agreement whereby Unum would accept the psychiatrist's narrative report.  After the report was received and reviewed by Unum, and after Kohn retained counsel, Unum decided to begin the disability payments to Kohn in July 2000, eight months after Kohn filed his claim.  (Def.'s Statement of Undisputed Facts ¶ 65; Pl.'s Counterstatement of Undisputed Facts ¶ 84.)

By 2002, another individual, Megan Orio, assumed responsibility for handling Kohn's claim.  During this time, after Unum determined that Kohn would probably not recover from his disability given his progress over the past two years, Unum began ongoing investigations into the status of Kohn's disability.  In October 2002, Unum notified Kohn that it intended to conduct an

independent medical examination (hereinafter "IME").  The IME initially was to be conducted by both a psychiatrist and a psychologist.  Kohn, however, challenged Unum's request for a psychologist's analysis, noting that the disability policy required "physical examinations" as part of the IME, which a psychologist would not have been professionally capable of performing. After several communications between the parties, Unum suspended disability payments to Kohn on March 3, 2003.  (Def.'s Statement of Undisputed Facts ¶ 83; Pl.'s Counterstatement of Undisputed Facts ¶ 86.)

In response to the suspension, Kohn filed a lawsuit against Unum in state court, seeking a declaratory judgment on Kohn's claim.  During the course of discovery in that action, Kohn came across the telephone list obtained by Moran.  Unum reinstated Kohn's benefits on March 24, 2003, although the parties dispute the motive behind the decision.  (Def.'s Statement of Undisputed Facts ¶ 65; Pl.'s Counterstatement of Undisputed Facts ¶ 84.)  While Unum notes that the reinstatement apparently occurred on the same day the lawsuit was filed, Kohn argues that the reinstatement only occurred after Kohn had retained a lawyer who had threatened litigation.  Importantly, Kohn's payments were suspended for 3 weeks, but eventually Kohn was paid for all of the benefits that were suspended during the three weeks at the end of March.

Once the parties decided on a mutually agreeable psychiatrist to perform the IME, the psychiatrist determined that there were several issues with Kohn's disability status.  Many of these issues, however, were the same ones Unum had identified in the months following the initial filing of the claim.  Although the IME psychiatrist was concerned about Kohn's failure to pursue appropriate treatment, Unum continued to pay for Kohn's disability payments.

      C.     Procedural Background

Kohn filed the current Complaint against Unum on October 20, 2004.  While Unum and Kohn have a fairly extensive history of conflict, the Complaint focuses on a narrow aspect of the dispute, and Kohn alleges that, during its handling of Kohn's claim, Unum committed violations of insurance bad faith, 42 Pa. Cons. Stat. Ann. § 8371, and the common law tort of invasion of privacy.

Defendant filed a Motion for Summary Judgment on July 8, 2005 on both counts.  After receiving Plaintiff's response to Defendant's Motion, this Court granted a stay of the proceedings pending a decision by the Pennsylvania Supreme Court in Toy v. Metro. Life Ins. Co., 928 A.2d 186 (Pa. 2007), which the parties believed would impact Plaintiff's bad faith insurance claim. After the Pennsylvania Supreme Court rendered its decision in Toy, the parties filed additional briefing addressing Defendant's Motion for Summary Judgment and Toy's impact.

## II.   Jurisdiction and Legal Standard

     A.    Jurisdiction

As the parties in this case have diverse citizenship and because the amount in controversy exceeds $75,000, this Court has jurisdiction under 28 U.S.C. § 1332(a)(1).

     B.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is

"genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

## II.     Discussion

### A.     Bad Faith Insurance Claim

Unum's principal argument is that Kohn's bad faith claim must be dismissed because it is undisputed that Unum paid all benefits to which Kohn is entitled under the policy, and that there

can be no bad faith under the statute unless benefits have been denied.  The Pennsylvania Bad

Faith Insurance Statute, 42 Pa. Cons. Stat. Ann. § 8371 provides that:

> In an action arising under an insurance policy, if the court finds
> that the insurer has acted in bad faith toward the insured, the court
> may take all of the following actions:
> (1) Award interest on the amount of the claim from the date the
> claim was made by the insured in an amount equal to the prime
> rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. Ann. § 8371.  The statute, obviously, does not define "bad faith."  The

Pennsylvania Supreme Court has yet to establish a definitive standard or fully outline the limits

of the statute.  However, the Third Circuit and the Pennsylvania Superior Court have had several

opportunities to do so.  The standard most frequently articulated by these courts states that, "in

order to recover on a bad faith claim, the insured must prove:  (1) that the insurer did not have a

reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or

recklessly disregarded its lack of a reasonable basis in denying the claim."  Northwestern Mut.

Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005) (citing Keefe v. Prudential Prop. &

Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000)).  It appears that the traditional basis of a bad

faith claim is the denial of benefits to a claimant for improper purposes.  However, this Court

cannot grant summary judgment for two principal reasons.  First, although Kohn has by now

been paid all benefits to which he was entitled, Unum did initially deny and later suspend his

payments; second, a jury could find Unum's investigative methods constitute "bad faith."

The Third Circuit has predicted that the Pennsylvania Supreme Court will hold that a

denial or delay of benefits on a claim is necessary in order to trigger the coverage of the statute.

In <u>UPMC Health Sys. v. Metro. Life Ins. Co.</u>, 391 F.3d 497 (3d Cir. 2004), the Third Circuit

considered a claim by UPMC against Metropolitan Life Insurance Company ("Met Life"), a

dental insurance provider, under the Bad Faith Insurance statute.  The two companies had

negotiated a two-tier rate plan for dental insurance offered to UPMC's employees.  However,

Met Life did not anticipate the correct proportion of employees that would sign up for the two

rate plans, and it therefore began losing substantial sums of money on the policy.  Met Life,

invoking a provision in the policy which permitted a realignment of the rates, unilaterally

changed the insurance rate for UPMC and sent the new bill.  UPMC, in response, only paid the

original rate but also filed suit, seeking a declaratory judgment on its obligations under the policy

and damages under the Bad Faith Insurance statute.  Affirming the district court's grant of

summary judgment for the defendant on the bad faith claim, Judge Barry, writing for the court,

stated that, "[w]hile the alleged bad faith need not be limited to the literal act of denying a claim,

the essence of a bad faith claim must be the unreasonable and intentional (or reckless) denial of

benefits."  <u>Id.</u> at 506 (internal quotations and citations omitted).  In coming to this holding, the

court primarily relied on <u>Terletsky v. Prudential Prop. & Cas. Ins. Co.</u>, 649 A.2d 680 (Pa. Super.

Ct. 1994), and <u>O'Donnell v. Allstate Ins. Co.</u>, 734 A.2d 901 (Pa. Super. Ct. 1999).  For several

reasons, however, <u>UPMC</u> does not require a dismissal of Plaintiff's bad faith claim.

      First, the factual circumstances in the case at hand differ substantially from <u>UPMC</u>.  In

<u>UPMC</u>, the insurance company was in a dispute with the employer, not the insured.  In addition,

the action taken by the insurance company did not concern an investigation into a claim, a denial

or delay in paying out benefits, or any other traditional interaction between insurer and insured.

Instead, the conflict was more akin to two major companies disagreeing over the terms of a

contract, and the court's decision can not be interpreted as requiring the actual denial of benefits as the precursor of a bad faith claim.

Second, UPMC must be considered in light of an opinion written only one year before by Judge Barry in W.V. Realty Inc. v. Northern Ins. Co. of New York, 334 F.3d 306 (3d Cir. 2003), where the court affirmed the district court's denial of a motion for a judgment as a matter of law where the insurance company had initially denied but subsequently paid out all of the benefits owed to the plaintiffs prior to the litigation. In W.V. Realty, the plaintiffs were an owner and an operator of a banquet hall whose roof had collapsed due to snow and who had previously purchased insurance policies from the defendant, Northern Insurance. The two plaintiffs submitted claims under the policies in January 1996. Upon submitting the claims, the parties disputed whether the restoration period would be six months or two years long. In April, the plaintiffs again contacted Northern Insurance, explaining that their bank would not provide them with financing to rebuild the hall unless they were made aware of how much the insurance company would pay out on the claim. A month later, the accountants finished their calculations on a six-month restoration period basis, but the claims handler refused to release these calculations and refused to pay out the undisputed portion of the claim until the Fall of 1996, after some additional evidence was considered. Upon a dispute over the amount of the payout, a neutral umpire was appointed to judge each side's appraisal; he eventually awarded the plaintiffs over $1.2 million on the claim, instead of the $65,322.70 award that Northern Insurance calculated, which was mostly affirmed on appeal. However, Northern Insurance still refused to pay out the award.

The plaintiffs filed suit against Northern Insurance on two counts of insurance bad faith. After the case was removed to federal court, the district court permitted one of the bad faith claims to go forward.  The district court ruled in favor of the plaintiffs following a trial, and it also denied the defendant's motions for judgment as a matter of law and a new trial.  On appeal, Judge Barry, writing for the court, first reiterated the general standard for liability established in Terletsky.  The court, however, then recognized that bad faith was actionable "before, during or after litigation."  Id. at 313.  After discussing O'Donnell, the court noted that "those cases in which courts have permitted bad faith claims to go forward based on conduct which occurred after the insured filed suit all involved something, beyond a discovery violation, suggesting that the conduct was intended to evade the insurer's obligations under the insurance contract."  Id. at 314.  The court ultimately held that "[t]here was sufficient evidence submitted to the jury on the issue of bad faith."  Id. at 317.  The court highlighted the fact that Northern Insurance failed to pay out the undisputed portion of the claim, despite knowing that the plaintiffs were having trouble meeting their financial obligations.  Id.  It is important to note, however, that, while the plaintiffs were initially denied the benefits, Northern Insurance ultimately paid the full amount of the award prior to the start of litigation.  Id. at 311.

Third, Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680 (Pa. Super. Ct. 1994), does not dictate that a bad faith claim requires the denial of benefits.  Terletsky considered a bad faith claim brought against an insurer, Prudential, where the insured couple was denied benefits even after an arbitration award.  After the insured couple filed their claim, the parties could not agree on whether an independent medical examination was required, and also, the limit on the insurance benefits payout; the parties therefore went to arbitration.  After the arbitrator required

an independent medical examination, Prudential made a settlement offer to the insured couple of

$57,500, which they rejected as being too low.  The arbitrator subsequently awarded each of the

plaintiffs $125,000.  Prudential decided to appeal the award, apparently on the basis that the

insurance policy did not allow a practice of "stacking" claims beyond the limits of the insurance

policy.  However, Prudential later paid out the awarded amounts and dropped the appeal.

        The insured couple, however, filed separate suits, which were later consolidated, against

Prudential for violations of the Bad Faith Insurance statute.  After the trial court awarded

damages for the bad faith claims, the insurance company appealed.  The Pennsylvania Superior

Court reversed the decision of the trial court, ultimately holding that the insurance company did

not act in bad faith, since the insurance company had good reason to believe both that the claims

deserved an independent medical examination and that the settlement amounts reasonably

approximated the value of the claims.  The court first provided the traditional standard for

liability on a bad faith claim: "the defendant did not have a reasonable basis for denying benefits

under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in

denying the claim."  Id. at 125.  Considering the claims of the plaintiffs, the court held that the

insurance company had a reasonable basis for offering the low settlement amounts to the couple

prior to the arbitration award.  Id. at 125-26.  The court also held that the finding of liability was

against the great weight of the evidence when the insurer appealed the arbitration award and that

the insurance company had a reasonable basis for not immediately paying out the awards given

the lack of clarity on the legality of "stacking" for purposes of insurance coverage benefits.  Id. at

127-29.  Of note, while the Terletsky court did provide a basic standard for a bad faith claim, it

did not address the question of whether an act outside the denial of benefits could itself be

actionable under the Bad Faith Insurance statute.  Instead, the opinion limited its analysis to whether there was evidence of bad faith on the part of the insurer in taking the acts at issue.

Next, O'Donnell indicates that a bad faith claim can be triggered by conduct other than simply a denial of benefits.  In O'Donnell v. Allstate Ins. Co., 734 A.2d 901 (Pa. Super. Ct. 1999), the Pennsylvania Superior Court considered a bad faith claim against an insurance company arising out of a homeowner's insurance policy dispute.  O'Donnell's home was covered by a homeowner's insurance policy with Allstate when O'Donnell's daughter filed a claim for an alleged robbery of the home that occurred while the house was vacant.  While the claim was being processed, the insurer noticed several irregularities, including that many of the items had been purchased by the daughter and not O'Donnell.  The insurer requested more information to investigate the claim, such as sworn statements attesting to the loss of the items and contacting O'Donnell, who was in a long-term care facility.  After apparently becoming frustrated with the delay and the investigation methods, O'Donnell's daughter filed a lawsuit against the insurer for, inter alia, bad faith insurance, "claiming that despite her efforts to comply with Allstate's requests, the insurer had unreasonably refused to evaluate her claim and issue either a denial or payment for the stolen items."  Id. at 904.  After a jury verdict was rendered for the insurer, the plaintiff appealed.

In its opinion, the Pennsylvania Superior Court considered "whether in an action for bad faith against an insurer, the jury is restricted to considering only evidence of bad faith which occurred prior to the filing of the lawsuit, or, whether it may also consider evidence of an insurer's bad faith conduct occurring during the pendency of litigation."  Id.  The court first laid out the traditional conduct that triggered the bad faith statute:  a "frivolous or unfounded refusal

to pay the proceeds of the policy."  Id. at 905.  However, the court emphasized that "[i]t is now

clear . . . that section 8371 [the Bad Faith Insurance statute] is not restricted to an insurer's bad

faith in denying a claim.  An action for bad faith may also extend to the insurer's investigative

practices."  Id. at 906.  The court agreed that, "[g]iven the expanding applicability of the bad faith

statute it is now clear . . . that bad faith suits are not restricted to the denial of claims, but, rather,

may extend to the misconduct of an insurer during the pendency of litigation."  Id. (internal

quotations and citations omitted).  The court therefore held that "the conduct of an insurer during

the pendency of litigation may be considered as evidence of bad faith under section 8371."  Id. at

907.  Given the facts of the case, however, the court determined that the plaintiff had failed to

show that the insurer's post-litigation acts were made in bad faith.  Id. at 907-10.

     O'Donnell and other Superior Court decisions indicate that the Bad Faith Insurance

statute should be given a liberal and broad, rather than a narrow construction, by the courts.

While UPMC implies that acts outside a denial of benefits can not trigger the Bad Faith

Insurance statute, the W.V. Realty and O'Donnell facts show situations where courts allow a bad

faith claim to proceed based on facts other than withholding benefits.  "When a state's highest

court has yet to speak on a particular issue, it becomes the role of the federal court to predict how

[the state's highest court] would decide the issue were it confronted with the problem.  To that

end, we should give careful consideration to decisions of the state's intermediate appellate courts

. . . ."  Jaworowski v. Ciasulli, 490 F.3d 331, 333 (3d Cir. 2007) (internal quotations and citations

omitted).  As the Superior Court has indicated, the statute is to be given a broad interpretation,

and it is clear that " bad faith suits are not restricted to the denial of claims."  O'Donnell, 734

A.2d at 906.

W.V. Realty clearly teaches us that temporary denials or suspension of benefits can be actionable under the statute even if benefits are eventually paid.  Similarly, Unum denied Kohn disability benefits twice, leading up to this case.  There is significant dispute by the parties concerning whether Unum suspended the payments in good faith or bad faith.  However, the investigative tactics by Unum may lead a jury to conclude that Unum's suspension of the benefits and general handling of Kohn's claim was conducted in bad faith, including the acquisition of the phone records.  A jury may find that Unum's "conduct was intended to evade the insurer's obligations under the insurance contract."  W.V. Realty, 334 F.3d at 314.

Though the Court has no opinion on the merits of Plaintiff's claim, Plaintiff has produced sufficient evidence to allow a jury to decide whether Unum's investigate techniques were improper and violated the Bad Faith Insurance statute.  The fact that Kohn has been paid all benefits to which he is entitled is very relevant.  The Court will have to draft jury instructions which carefully explain the contours of the Pennsylvania statute in the context of the facts, and include the concept that an insurer is entitled to conduct a reasonable investigation before deciding whether to pay benefits to its insured.  Given the uncertainty of the Pennsylvania case precedent, it is preferable that Unum's conduct be considered on the basis of a full factual record, developed at a trial, rather than a summary judgment record without a jury's verdict and jury instructions.

B.      Invasion of Privacy Claim

Plaintiff has also produced sufficient evidence to create a genuine issue of fact as to whether Unum's investigation is actionable as a common law invasion of privacy tort.  "It is well

established in Pennsylvania that a violation of the right of privacy is an actionable tort." <u>Vogel v. W.T. Grant Co.</u>, 327 A.2d 133 (Pa. 1974); <u>see also</u> <u>Bennett v. Norban</u>, 151 A.2d 476 (Pa. 1959). "The gist of privacy is the sense of seclusion, the wish to be obscure and alone, and it is a trespass to abuse these personal sensibilities." <u>Bennett</u>, 151 A.2d at 479. "[T]o be actionable, the alleged invasion of that right must be unlawful or unjustifiable." <u>Lynch v. Johnston</u>, 463 A.2d 87, 89 (Pa. Commw. Ct. 1983). In considering a claim for invasion of privacy, the standard in Pennsylvania is set out by the Restatement (Second) of Torts. <u>See</u> <u>Harris v. Easton Pub'g Co.</u>, 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984) ("We believe that the Restatement most ably defines the elements of invasion of privacy as that tort has developed in Pennsylvania.").

The Restatement (Second) of Torts § 652B, addressing the tort of intrusion upon seclusion, provides that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." In order to constitute an "invasion" for purposes of liability, the act may be "(1) by physical intrusion into a place where the plaintiff has secluded himself, (2) by use of the defendant's senses to oversee or overhear the plaintiff's private affairs, or (3) some other form of investigation or examination into plaintiff's private concerns." <u>Harris</u>, 483 A.2d at 1383; Restatement (Second) Torts § 625B cmt.b. Liability for an intrusion will only attach if "the intrusion is substantial and highly offensive to a reasonable person." <u>Chicarella v. Passant</u>, 494 A.2d 1109, 1114 (Pa. Super. Ct. 1985); <u>see also</u> Restatement (Second) of Torts § 625B cmt. d.

The Pennsylvania Superior Court has considered the viability of an intrusion upon seclusion claim in a factually similar, though not identical, scenario in <u>Nagy v. Bell Tel. Co. of</u>

-18-

Pa., 436 A.2d 701 (Pa. Super. Ct. 1981).  In that case, the court considered a suit for an unauthorized retrieval of phone records.  The defendant, despite the plaintiffs' request to the telephone company to keep their records private, had "'deliberately persuaded' a Bell employee to reveal to him the long-distance telephone numbers" called by the household of his estranged wife.  Id. at 704.  Considering whether the act amounted to an invasion of privacy, the Pennsylvania Superior Court held that "the act alleged here, viz., obtaining from a telephone company a list of telephone numbers called long-distance from a certain subscriber's telephone," was not a "highly offensive or objectionable act whose commission would lead to tort liability." Id.

There are several reasons, however, that, as a jury may find Unum retrieved the phone records, or is responsible for it, the acts would be distinctly more offensive than the retrieval committed in Nagy.  First, the plaintiff and the defendant in Nagy were husband and wife, a relationship with a significantly lower expectation of privacy than between an insurance company and an insured individual.  Second, the acts allegedly committed by Unum are also much more intrusive; as opposed to Nagy where the defendant simply gathered several phone numbers, Unum allegedly took several additional steps, including pretending to be Plaintiff, calling many of the phone numbers, asking at least one person what they knew of Plaintiff, and gathering the names and other identifying information of those who owned the phone lines called.  Also, the retrieval of Plaintiff's records may not have been limited to one occurrence, as it was in Nagy, and may have been committed by Unum several times and over an extended period.

Finally, the Nagy decision was decided over 25 years ago.  The Pennsylvania courts have not rendered a decision since that time concerning the present offensiveness of such an act.  As a

significant period of time has passed and society's privacy expectations have radically changed since 1981, and as the alleged investigation conducted by Unum is remarkably more offensive than the acts committed in <u>Nagy</u>, this Court holds that Plaintiff has presented sufficient evidence to withstand Defendant's Motion for Summary Judgment on the invasion of privacy claim.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JEFFREY K. KOHN, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| UNUMPROVIDENT CORPORATION, | : | |
| Defendant | : | No. 2:04-cv-4929 |

_____

## **ORDER**

AND NOW, this   31st   day of October, 2008, for the reasons stated in the foregoing Memorandum, it is hereby ORDERED that

1.      Defendants' Motion for Summary Judgment (Doc. 72) is DENIED;

2.      A final pretrial conference by telephone is scheduled for Tuesday, November 4th at 11:30 a.m. to set a trial date.  Plaintiff's counsel will initiate the call, and when all parties are on the line, call chambers at 267.299.7520.

BY THE COURT:

s/Michael M. Baylson

_____

Michael M. Baylson, U.S.D.J.

O:\Tony\04-4929 Kohn v. Unum\Research\SJ Memo.wpd